IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
DELTA DIVISION

CHARLES DANIELS GREEN                                                PLAINTIFF
ADC #113257

V.                         Case No. 2:22-CV-00083-BSM-BBM

GARY KERSTEIN, Health Care Provider,
Well Path; and TRACY BENNETT, APN,
Health Care Provider, Well Path                                      DEFENDANTS

**RECOMMENDED DISPOSITION**

This Recommended Disposition ("Recommendation") has been sent to United States District Judge Brian S. Miller. Either party may file written objections to this Recommendation. If objections are filed, they should be specific and should include the factual or legal basis for the objection. To be considered, objections must be received in the office of the Court Clerk within 14 days of this Recommendation. If no objections are filed, Judge Miller can adopt this Recommendation without independently reviewing the record. By not objecting, parties may also waive the right to appeal questions of fact.

**I.     INTRODUCTION**

On May 18, 2022, Plaintiff Charles Daniels Green ("Green"), a prisoner then incarcerated in the East Arkansas Regional Unit ("EARU") of the Arkansas Division of Correction ("ADC"), filed a *pro se* Complaint pursuant to 42 U.S.C. § 1983, alleging violations of his constitutional rights while incarcerated at EARU. (Doc 2). Green subsequently filed an Amended Complaint on July 13, 2022. (Doc. 3). In both Complaints,

Green alleges deliberate indifference to his serious medical needs, including his kidney disease, high blood pressure, and heart and lung issues. (Doc. 2 at 4; Doc. 3 at 1–3).

After the Court screened the Complaints[1] in accordance with the Prison Litigation Reform Act and considered Defendants' Motion for Partial Summary Judgment on the issue of exhaustion of administrative remedies, Green was allowed to proceed with deliberate-indifference claims against WellPath provider Dr. Gary Kerstein ("Dr. Kerstein") and WellPath Advanced Practice Nurse Tracy Bennett ("Nurse Bennett") (collectively, "Defendants") related to care received on May 7, May 19, August 6, and August 24, 2021. (Doc. 6; Doc. 36 at 12). Green sues the Defendants in their official and individual capacities. (Doc. 2 at 2). Green seeks compensatory damages and injunctive relief. (Doc. 2 at 5; Doc. 3 at 6).

On March 13, 2024, Defendants filed a Motion for Summary Judgment, a Brief in Support, and a Statement of Undisputed Facts, arguing that Green's claims fail on the merits. (Doc. 44 at 2; Doc. 45 at 3–6; Doc. 46). On April 8, 2024, Green filed a Response to Defendants' Motion, a Brief in Support, and a Response to Defendants' Statement of Undisputed Facts. (Docs. 48–50). Defendants did not file a reply, and the time for doing so has passed. LOCAL RULE 7.2(b). Thus, the issues are joined and ready for disposition.

---

[1] Both the Complaint and the Amended Complaint were served on the Defendants and were construed together as constituting Green's claims. *See* (Doc. 6) (screening Green's claims considering both documents).

For the reasons set forth below, the Court recommends Defendants' Motion for Summary Judgment be granted.[2]

## II. FACTUAL BACKGROUND

Green suffers from kidney disease, high blood pressure, and lung and heart issues.[3] (Doc. 2 at 4; Doc. 3 at 1). Although incarcerated in the ADC, Green was receiving treatment from a non-ADC medical provider, nephrologist Dr. Muhammad Kashif ("Dr. Kashif"),[4] for "issues related to his kidneys and underlying kidney disease." (Doc. 29-1 at 1, 3, ¶¶ 5, 10). Dr. Kashif saw Green via telehealth visits, monitoring Green for signs and symptoms of kidney disease and evaluating Green's candidacy for hemodialysis. *Id.* at 1–2, ¶¶ 5, 8. Dr. Kashif then made recommendations for "testing or services" to in-unit medical providers, who ultimately determined Green's course of treatment. *Id.* at 1, ¶¶ 2–5.

On April 30, 2021, Green attended a nephrology consultation with Dr. Kashif. (Doc. 54-1). Thereafter, Dr. Kashif recommended blood pressure checks one to two times per week and an increase in Green's blood pressure and kidney medication. *Id.* at 2. Dr. Kashif

---

[2] Summary judgment is appropriate when the record demonstrates that there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249–50 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323. Thereafter, the nonmoving party must present specific facts demonstrating that there is a material dispute for trial. *See* FED. R. CIV. P. 56(c); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). "Courts must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party." *Brand v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 934 F.3d 799, 802 (8th Cir. 2019) (citing *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 216 (2015)).

[3] Additionally, one of Green's relevant grievances mentions issues with Green's diabetes care. (Doc. 5 at 24–25). The medical records reflect a diagnosis of diabetes mellitus and diabetic chronic kidney disease. (Doc. 46-3 at 2).

[4] The Court previously granted Green's motion to voluntarily dismiss Dr. Kashif as a defendant. (Doc. 41).

3

further noted there was no indication for hemodialysis and scheduled a two-month follow-up visit. *Id.*

Dr. Kerstein, an in-unit medical provider at EARU, reviewed Dr. Kashif's recommendations and saw Green via telehealth on May 7, 2021. (Doc. 46-3 at 1). During the visit, Green asked Dr. Kerstein for work restrictions because he "get[s] hot" when working outside. *Id*. Dr. Kerstein denied the request because Green "did not have a physical condition that would need restrictions." *Id.* Green then admitted that the "real reason" he wanted restrictions was because working outside caused him to miss insulin doses. *Id.*

Dr. Kerstein increased Green's medication, as recommended by Dr. Kashif, and ordered blood pressure checks twice a week for two weeks. (Doc. 46-3 at 3). Dr. Kerstein then advised Green that he could follow up with sick call, as needed, for any complaints regarding outside work. *Id.* at 3. According to his notes, Dr. Kerstein was going to reach out to "Hatchett/Douglas" via email to arrange timely insulin doses for Green. *Id.*

On May 18, 2021, Green was seen by Nurse Bennett, another in-unit medical provider, after asking to be "reevaluated." (Doc. 46-4 at 1). Green again asked to be restricted to inside work. *Id*. He complained that he was missing pill call, had vitamin D deficiency, and that, according to Dr. Kashif, he would be starting dialysis in one month. *Id.*

Nurse Bennett took Green's vital signs and noted that he had an elevated blood pressure of 180 over 99. (Doc. 46-4 at 1). But, otherwise, she found that Green was in no apparent distress and noted that Green denied chest pain or discomfort. *Id.* Nurse Bennett reviewed Green's medication log and observed that Green had a "long history of

4

noncompliance" when he was allowed to keep his medication on his person. *Id*. She counseled Green that outside work would help him produce vitamin D and that pill-call times are available for outside workers. *Id.* at 3. She also told Green to review his medical jacket for Dr. Kashif's note, which stated there was no indication for dialysis. *Id*. It should also be noted that Nurse Bennett informed Green that the medical department does not make job assignments. *Id*.

On June 30, 2021—approximately eight weeks after Dr. Kerstein denied Green's request for work restrictions—Dr. Kashif saw Green for his two-month nephrology follow-up. (Doc. 46-6). Dr. Kashif found that: (1) Green had elevated PTH, uric acid, and creatinine levels; (2) Green's kidney disease had progressed from stage III to stage IV; and (3) Green was approaching the need for dialysis. (Doc. 46-6 at 1; Doc. 46 at 3, ¶ 8; Doc. 50 at 3, ¶ 8). Among other recommendations, Dr. Kashif changed the dosage of certain medications, started Green on furosemide 40mg daily, and referred Green to a cardiologist for a stress test. (Doc. 46-6 at 1). Dr. Kashif noted that Green should not work in heat. *Id*. Specifically, the "summary" notes state that Green "[c]annot work in the heat as he is approaching dialysis. He can work in[]doors." *Id.* at 2. The summary notes go on to state, "[p]lease change his work duty ASAP to a work detail out of the sun [and] heat." *Id.* Dr. Kashif further requested monthly follow-ups. *Id.* On July 2, 2021, Dr. Kerstein reviewed Dr. Kashif's recommendations, noted that Green was pending dialysis, and issued Green a prescription for "[i]n doors work only no work in sun/heat." (Doc. 46-7 at 1, 3).

On July 28, 2021, Dr. Kashif saw Green for his monthly nephrology follow-up. (Doc. 46-8). Dr. Kashif noted that Green's creatinine levels had decreased and that

hemodialysis was no longer indicated. *Id*. at 1. He noted that Green should avoid nonsteroidal anti-inflammatory drugs (NSAIDs) and follow-up in three months. *Id*. at 2. Dr. Kashif requested that Green undergo a number of labs but otherwise recommended "no changes to [Green's] nephrology management." *Id.*

On August 2, 2021, Nurse Bennett reviewed Dr. Kashif's July 28, 2021 recommendations. (Doc. 46-9). Nurse Bennett ordered labs and instituted a no-NSAID order. *Id.* at 2–3. Nurse Bennett's notes state: "No indication for [hemodialysis] (Dr. Kashif recommended a no outside work script in anticipation of pt getting worked up for dialysis, consider termination of script)[.]" *Id.* at 3.

On August 6, 2021, Green was seen by Dr. Kerstein. (Doc. 46-10 at 1). Dr. Kerstein reviewed the notes from Dr. Kashif's July 28, 2021 consult and found "no further recommendations for no work in heat outside. There was a recommendation by Neph [sic] prior to be worked up for possible dialysis and recent consult states 'no indication for dialysis[.]'" *Id.* Dr. Kerstein terminated Green's no-outside-duty prescription. *Id.* at 2. Dr. Kerstein further noted that Green was non-compliant with his blood pressure medication taken three times daily. *Id.* He modified Green's blood pressure medication to be taken twice daily but maintained the same dosage. *Id.*

On August 17, 2021, Green was seen at sick call by non-party Nurse David Smith ("Nurse Smith"). (Doc. 46-11). Nurse Smith ordered minoxidil to treat Green's hypertension, as recommended by Green's cardiologist, and counseled Green regarding the importance of taking his medication and any side effects he should report. *Id.* at 1–2. Nurse

6

Smith noted Green was in "[n]o acute distress," and Green denied any chest pain, shortness of breath, dizziness, nausea, or vomiting. *Id*. at 1.

On August 24, 2021, Green presented to sick call for left-sided numbness that had been on-going "for over 1 week." (Doc. 52-1 at 2). Green denied any trauma, injury, or pain but claimed that he had a birth defect on his left arm that caused muscle atrophy. *Id.* Nurse Bennett noted that Green did not appear to be in distress. *Id.* Nurse Bennett then performed a host of examinations, including a straight-leg test, spine palpitations, and test of grip strength—all with normal results. (Doc. 52-1 at 2). However, she noted that Green was a "no show" for his blood pressure medication that morning and had an elevated blood pressure: 210/102. *Id.* She administered clonidine and had Green sit in the waiting area. *Id.* After an hour, Green's blood pressure was lowered to "an acceptable level of 126/63." *Id*.

Dr. Kashif continued to have regular nephrology consults with Green. (Doc. 29-1 at 2, ¶ 8). Notably, there is no record that Dr. Kashif ever made another recommendation regarding Green's work detail or requested work restrictions for Green. On November 30, 2022—over a year after the events at issue in this action—Dr. Kashif found that Green had progressed to end stage renal disease and recommended that he begin hemodialysis. *Id.* at 2, ¶ 9. Shortly thereafter, Green was transferred to the ADC's Ouachita River Correctional Unit ("ORCU")—a facility that provides dialysis treatment to inmates. (Doc. 9; Doc. 29-1 at 3, ¶ 10).

### III. DISCUSSION

Green alleges that Dr. Kerstein and Nurse Bennett were deliberately indifferent (1) when they refused to issue him work restrictions on May 7 and May 18, 2021; (2) when

7

Dr. Kerstein revoked his work restrictions on August 6, 2021; and (3) when Nurse Bennett failed to examine him properly and "order [an] x-ray and lab work" on August 24, 2021. (Doc. 2; Doc. 3 at 3–5). Defendants argue that Green's claims fail on the merits because "there is no evidence to support [Green's] allegation that Defendants deliberately disregarded [Green's] serious medical needs." (Doc. 45 at 3).

### A.     Deliberate Indifference

Defendants are alleged to have placed Green in a work assignment that posed a substantial risk of serious harm to his health *and* to have been deliberately indifferent to his serious medical needs. *See* (Doc. 3 at 3–4). Thus, Green proceeds on two distinct theories of deliberate indifference: (1) deliberate indifference regarding his work assignment; and (2) deliberate indifference to his serious medical needs. The Court turns first to the "work assignment" claim.

#### 1.     Work Assignment

Like other deliberate-indifference claims brought under the Eighth Amendment, an inmate alleging deliberate indifference to a work assignment must make two showings—one objective and one subjective. *Kulkay v. Roy*, 847 F.3d 637, 642 (8th Cir. 2017). Objectively, Green must show that Defendants compelled him to perform work that posed a substantial risk of serious harm—that is, work that was dangerous to his life or health, unduly painful, or required strength beyond his capacity. *Id.* at 643; *Choate v. Lockhart*, 7 F.3d 1370, 1374 (8th Cir. 1993). Subjectively, the Defendants must have been aware of the substantial risk of harm to Green and failed to respond reasonably to it. *See Kulkay*, 847 at 643 (citing *Young v. Selk*, 508 F.3d 868, 873 (8th Cir. 2007)).

For the objective prong, Green argues that, as an insulin-dependent diabetic with severe hypertension and "stage III/IV renal failure," his assignment to field work in the high heat was harmful to his health. (Doc. 49 at 2–3). He claims that his "renal failure accelerated and was exacerbated while Dr. Kerstein insisted [Green] remain on field duty." (Doc. 50 at 5). He further claims that, to the extent the pill-call records are correct,[5] those records will show that he missed doses of insulin and other medication as a direct result of his inability to attend pill call while performing field work. (Doc. 49 at 3).

For the subjective prong, Green argues that, as medical professionals, Dr. Kerstein and Nurse Bennett should have been aware that the "heat-stress inducing conditions from field work" were a risk to his health—especially after they were "overtly and adamantly…made aware of such by Dr. Kashif." (Doc. 49 at 2). He further argues that Nurse Bennett was aware that field work caused him to miss insulin doses because insulin is administered during mealtimes, and "[o]utside workers are provided sack lunches at site." (Doc. 50 at 3).

Green makes compelling arguments, but unfortunately for Green, they are unsupported by *evidence* in the record. In fact, there is no affirmative medical evidence showing that, objectively, working in the heat was dangerous to Green's health during the times at issue—from May to June 2021 or from August 2021 onward.[6] On June 30, 2021, Dr. Kashif wrote that Green could not work in the heat while he was approaching dialysis.

---

[5] Green claims that the pill call nurses did not keep proper records. (Doc. 49 at 3; Doc. 50 at 4).

[6] It is unclear from the record how long Green remained on outside-work duty.

9

(Doc. 46-6 at 2). Green was promptly removed from outside work, remained off during July 2021, and only returned to outside work when dialysis was no longer indicated. (*See* Docs. 46-7–46-10).

Green argues that his conditions improved *because* he was no longer working in the heat. (Doc. 50 at 4) ("Plaintiff's blood labs had improved because for those 30 days he was not experiencing heat stress conditions."). But Green's lay opinion, unsupported by any medical evidence, is nothing more than speculation and conjecture; it is insufficient to defeat summary judgment. *Rusness v. Becker Cnty., Minnesota*, 31 F.4th 606, 614 (8th Cir. 2022) (quoting *McConnell v. Anixter, Inc.*, 944 F.3d 985, 988 (8th Cir. 2019)).

Even if the Court were to assume, however, for the sake of analysis, that, objectively, outside work posed a substantial risk of harm to Green due to the heat and missed insulin doses, subjectively, Dr. Kerstein and Nurse Bennett were not deliberately indifferent to that risk. When told Green was missing insulin doses on May 7, 2021, Dr. Kerstein acted reasonably by following up with ADC officials to "arrange for [Green's] timely insulin doses." (Doc. 46-3 at 3). And, when informed of the same on May 18, 2021, Nurse Bennett indicated her belief that pill call *was* provided for outside workers. (Doc. 46-4 at 1). There is no record that Green raised the missed insulin issue with either Defendant, or anyone else, beyond these dates.

The same goes for the alleged harm caused by the heat. When questioned by Dr. Kerstein on May 7, 2021, Green denied any adverse consequences from working outside, such as shortness of breath, dizziness, nausea, or vomiting. (Doc. 46-3 at 1). Dr. Kerstein noted that he did *not* believe Green's conditions required restrictions. *Id.* And Green

10

admitted that the real issue was missed insulin doses—an issue that Dr. Kerstein took steps to correct. *Id.* at 3. Nurse Bennett, on the other hand, noted that the sun exposure would be beneficial for Green's vitamin D deficiency. (Doc. 46-4 at 3).

Then, after Green's July 28, 2021 consult, during which Green showed marked improvement, Dr. Kerstein and Nurse Bennett both read Dr. Kashif's notes to mean that outside work restrictions were no longer needed because Green was no longer approaching dialysis. At most, Defendants were negligent in their understanding and interpretation of Dr. Kashif's recommendations—a finding that does not amount to cruel and unusual punishment under the Eighth Amendment. *Kulkay*, 847 F.3d at 645 ("[M]ere negligence is insufficient to state a claim under the Eighth Amendment.).

Thus, to the extent outside work posed a substantial risk to Green before or after July 2021, Dr. Kerstein and Nurse Bennett either did not infer the risk, or, in the case of Dr. Kerstein and the missed insulin, took reasonable steps to alleviate the risk. *See Kulkay*, 847 F.3d at 644. ("To show deliberate indifference via circumstantial evidence, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.") (cleaned up). In sum, Defendants are entitled to summary judgment on Green's deliberate-indifference work assignment claim because the record is devoid of any evidence that (1) the outside work assignment posed a significant risk of harm to Green; or (2) that Defendants were deliberately indifferent to that risk.   !

### 2. Serious Medical Needs

For his second deliberate-indifference claim, Green must show that he had (1) "an objectively serious medical need"; and (2) that Defendants "knew of and disregarded that need." *Shipp v. Murphy*, 9 F.4th 694, 703 (8th Cir. 2021) (quoting *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997)). "To be objectively serious, a medical need must have been 'diagnosed by a physician as requiring treatment' or must be 'so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'" *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014) (quoting *Scott v. Benson*, 742 F.3d 335, 340 (8th Cir. 2014)). The parties do not dispute that Green was suffering from a serious medical need during each relevant date. *See Jackson*, 756 F.3d at 1065; (Doc. 46 at 1, ¶ 4; Doc. 50 at 2, ¶ 4). Thus, the Court's analysis focuses on whether Dr. Kerstein and Nurse Bennett were deliberately indifferent to his serious medical needs on the days in question.

As explained above, deliberate indifference is a high threshold that goes well beyond negligence or gross negligence. *Hall v. Higgins*, 77 F.4th 1171, 1179 (8th Cir. 2023); *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010). To establish deliberate indifference, there must be evidence suggesting Defendants "recognized that a substantial risk of harm existed *and* knew that their conduct was inappropriate in light of that risk." *Shipp*, 9 F.4th at 703 (emphasis in the original); *Smith v. Lisenbe*, 73 F.4th 596, 600 (8th Cir. 2023). At this stage, a plaintiff must show grossly incompetent or inadequate care "so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care." *Dulany*, 132 F.3d at 1242 (citation omitted). A mere disagreement with the course of medical care does

not rise to the level of a constitutional violation. *Langford*, 614 F.3d at 460; *Barr*, 909 F.3d at 921–22.

Again, there are only four dates at issue: May 7, May 18, August 6, and August 24, 2021. Green's main qualm with the medical care provided on May 7 and May 18 was that, on those dates, Dr. Kerstein and Nurse Bennett failed to issue him a no-outside-work script. (Doc. 3 at 1–2, 4; Doc. 19-1 at 35, 40). He also claims Dr. Kerstein was deliberately indifferent by terminating his work restriction on August 6. (Doc. 3 at 2; Doc. 19-1 at 43). As set forth above, Dr. Kerstein and Nurse Bennett did not appreciate any risk outdoor work had on Green's health and, thus, were not deliberately indifferent on those dates.

As for the August 24 visit, Green alleges that he presented to sick call with swelling on his left side, numbness, shortness of breath, and "lots of pressure in [his] left rib cage." (Doc. 3 at 3). He claims Nurse Bennett failed to conduct a proper examination, "just running her hands down the left side of his body," and should have ordered an "x-ray and lab work." *Id.* at 4–5. This amounts to a mere disagreement over Nurse Bennett's course of treatment. The medical records for that date show that Nurse Bennett conducted several examinations and, other than high blood pressure, found no abnormal results. (Doc. 52-1 at 2). She successfully lowered Green's blood pressure by administering clonidine. *Id.*

Moreover, Defendants attach the Affidavit of Dr. Nicholas Gowen, M.D., FACP ("Dr. Gowen").[7] (Doc. 46-1). Dr. Gowen opined that the care provided on each day in

---

[7] Dr. Gowen is a board-certified hospitalist at the Central Arkansas Veterans Healthcare Administration and an Assistant Professor at the University of Arkansas for Medical Sciences. (Doc. 46-1 at 1, ¶ 2).

question—May 7, May 18, August 6, and August 24—was "appropriate, adequate, and timely." (Doc. 46-1 at ¶¶ 5–8). "In the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that he did not feel he received adequate treatment." *Cejvanovic v. Ludwick*, 923 F.3d 503, 508 (8th Cir. 2019); *see also Fourte v. Faulkner Cnty.*, 746 F.3d 384, 390 (8th Cir. 2014) (finding no deliberate indifference when medical providers "made efforts to cure the problem in a reasonable and sensible manner").

Confronted with Dr. Gowen's Affidavit and the medical records, Green has not put forth any refuting evidence. *See Dulany*, 132 F.3d at 1240. In fact, Green has not put forward *any* evidence that Defendants acted with a mental state "akin to criminal recklessness" or delivered treatment amounting to "intentional maltreatment" or a "refusal to provide essential care." *See Shipp*, 9 F.4th at 703; *Dulany*, 132 F.3d at 1241. Indeed, the Court notes that Green was not recommended to begin hemodialysis until November 30, 2022—over a year after the events at issue in this action. (Doc. 29-1 at 2, ¶ 8). Accordingly, Defendants are entitled to summary judgment on Green's deliberate-indifference claims in their individual capacities.

### B. Official Capacity Claims

Green also sues Defendants in their official capacities—which is the equivalent of a claim against their employer, Wellpath, LLC. *See Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010); *De Rossitte v. Correct Care Sols.*, LLC., 22 F.4th 796, 803–04 (8th Cir. 2022). But, because there is no evidence of an underlying constitutional

violation, the official-capacity claims fail as a matter of law. *Whitney v. City of St. Louis, Missouri*, 887 F.3d 857, 860 (8th Cir. 2018).

## IV.   CONCLUSION

IT IS THEREFORE RECOMMENDED THAT:

1. The Defendants' Motion for Summary Judgment, (Doc. 44), be GRANTED.

2. Green's individual and official-capacity deliberate-indifference claims against Dr. Kerstein and Nurse Bennett related to the May 7, 2021, May 18, 2021, August 6, 2021, and August 24, 2021 provider visits be DISMISSED with prejudice.

3. Judgment be entered accordingly.[8]

DATED this 8th day of January, 2025.

*(signature)*
UNITED STATES MAGISTRATE JUDGE

---

[8] All other claims against Dr. Kerstein and Nurse Bennett were previously dismissed without prejudice. (Doc. 41). Green's claims against Dr. Kashif were dismissed with prejudice. *Id.*